Filed 5/7/26  In re C.W. CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

| | |
|---|---|
| In re C.W. et al., Persons Coming Under the Juvenile Court Law. | C104398 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>L.W. et al.,<br>        Defendants and Appellants. | (Super. Ct. Nos. JV20221232, JV20221233) |

Appellants R.W. (mother) and L.W. (father), parents of the minors, appeal from the juvenile court's orders denying mother's petition for modification, terminating parental rights, and freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 388, 395; statutory section citations that follow are to the Welfare and Institutions Code.)  Mother claims the juvenile court abused its discretion when it denied her petition for modification and erred by finding the beneficial parental relationship exception to adoption did not apply.  She further claims the juvenile court and the Yolo County Health and Human Services Agency (Agency) failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).  Father joins in all of mother's claims, making no separate claims or arguments on

1

his own behalf.  We conclude the section 388 claim is forfeited and the parents have not otherwise established error.  We will therefore affirm the juvenile court's orders.

FACTS AND HISTORY OF THE PROCEEDINGS

In August 2022, the two minors, C.W. (age four) and E.W. (age one) (the minors), along with their seven-year-old sibling J.W. (who is not a party to this appeal but will be mentioned where relevant to the issues before us) (collectively, the children), came to the Agency's attention due to father's chronic substance abuse, his physical abuse of J.W., and the parents' neglect of all three children.  Most recently, father became upset during an argument with mother and began hitting J.W. when he learned J.W. wet the bed the previous night.  Mother contacted law enforcement and reported father's physical abuse of J.W., and claimed father had taken all her money and left to buy drugs.  She also reported that father regularly drank alcohol and used illegal substances.  The social worker interviewed father, who denied hitting J.W.  He admitted having used methamphetamine two weeks prior but refused to take a drug test stating he did nothing wrong.  Mother tested negative for all substances.

J.W. told the social worker that father hit him often and he feared father.  J.W. said his parents fought daily, both verbally and physically.  C.W. reported the parents fought and father hit her older brother J.W. but never hurt her or her younger brother E.W.  The social worker completed a safety plan with the parents whereby father would remain out of the home temporarily and mother would connect with supportive services.  Thereafter, however, the parents continued to argue and make threats towards one another and were hostile towards the social worker, resulting in the children being taken into protective custody.

The following day, mother reported she had changed the locks to her home, blocked father on her telephone, and she planned to file for divorce.  She was staying with her support person in case father returned, and she planned to stay until she obtained

2

a restraining order against father.  Mother also stated she signed up for individual and group counseling and was willing to do whatever was necessary to ensure her safety and the safety of the children.  The social worker developed a new safety plan and the children were returned to mother's custody.

Dependency Petition (§ 300)

On August 16, 2022, the Agency filed a dependency petition pursuant to section 300, subdivision (b), alleging the children were at substantial risk of harm as a result of father's untreated substance abuse and his volatile and aggressive behavior, the parents' domestic violence in the children's presence, and mother's failure to protect the children against father's substance abuse and physical aggression toward J.W.  The juvenile court ordered the children detained from father and left in mother's custody and care.

In September 2022, the juvenile court sustained the petition and exercised dependency jurisdiction over the children, all of whom remained in mother's custody.  At the disposition hearing the following month, the court ordered reunification services for father and family maintenance services for mother.

Supplemental Petition (§ 387)

On February 15, 2023, the Agency filed a supplemental petition pursuant to section 387 alleging the children sustained injuries as a result of physical abuse by mother's boyfriend Richard, as well as mother's failure to protect them from Richard. The juvenile court ordered all three children detained, and ordered services provided to mother, including alcohol and drug testing, parenting education, domestic violence class, family life skills program, and general and mental health counseling.  The court also ordered weekly visitation for mother.

In late-February 2023, the Agency reported mother failed to enroll in a domestic violence program and showed limited insight on the issues that brought her before the juvenile court.

In early May 2023, the Agency reported the minors were placed together and J.W. was placed with another caretaker. C.W. had sleep issues, waking up crying and screaming and needing comfort to go back to sleep. She was anxious and appeared agitated and angry before visits with father. C.W. reported sexualized behavior by J.W. towards her. The caregiver had concerns about C.W.'s mental health based on her developmental screening results. E.W. was discharged from daycare after several incidents of biting others. E.W.'s developmental assessment could not be completed because mother was either busy, did not answer calls, rescheduled, or did not show up.

Mother's boyfriend Richard had been arrested for possession of methamphetamine and drug paraphernalia and was released six days later. Thereafter, he was observed to be in mother's home. Father reported being involved in a physical altercation with Richard on April 9, 2023, outside of mother's home. Mother claimed she was attending domestic violence groups but she had not yet signed a release of information and was not certain she was willing to do so. The Agency reported mother tested positive for methamphetamine twice in April 2023, and positive for alcohol in both April and May 2023.

The Agency further reported that mother failed to follow up with the minors' medical appointments and appointments with service providers. She was inappropriate during visits, raising concerns about the minors' eating habits, checking their bodies for bruises, and commenting on their overall hygiene despite being instructed to raise her concerns with the social worker and being warned that visits would be cut short if she continued. Concerns persisted about mother's limited insight into the issues that brought the family before the juvenile court. The Agency was also concerned that mother was aware of sexual behaviors between J.W. and C.W. and failed to address the situation with the Agency or take the necessary steps to protect the children. Further, mother failed to enroll in a court-ordered domestic violence program and pursued her relationship with Richard, allowing him to be around and discipline the children despite his relapse, a

4

pattern similar to her relationship with father which led to the Agency's intervention in the first instance.

Amended Supplemental Petition (§ 387)

On May 5, 2023, the Agency filed an amended supplemental petition pursuant to section 387 alleging the children were at substantial risk of harm as a result of mother's inability or unwillingness to protect them from unsafe individuals such as Richard, who was seen verbally and physically abusing J.W. It was further alleged that the children were at substantial risk of harm, as the minors had sustained bruising on their bodies likely caused by nonaccidental trauma. It was also alleged that the children were at substantial risk of harm due to mother's inability or unwillingness to protect and supervise them from sexual behaviors between siblings, namely J.W. exhibiting sexual behaviors towards C.W. and E.W. Mother was reportedly made aware of these sexual behaviors in December 2022 but did not take steps to address or prevent the behaviors from recurring.

Disposition Report

The Agency's May 2023 disposition report noted law enforcement was called to mother's home several times between December 2022 and March 2023 to address domestic violence issues between mother and father. Mother continued her relationship with Richard notwithstanding his history of substance abuse, his recent relapse, and his arrest. Mother reported completing 18 weeks of parenting classes and starting individual therapy. She was maintaining regular weekly visitation with the minors but continued to examine the minors for abuse and neglect by the caretakers.

At a hearing on May 22, 2023, it was reported that mother had recently been arrested for assault on and threats against two witnesses in the case. The juvenile court ordered mother to have no contact with the witnesses. In an addendum report, the

Agency noted that mother's behaviors continued to escalate, as evidenced by text messages mother sent cursing at, berating, and threatening the social worker.

Jurisdiction and Disposition Hearing

On July 25, 2023, the juvenile court sustained the allegations in the amended supplemental petition and ordered the minors removed from mother's custody and continued in out-of-home placement with reunification services to be provided to both parents.

Interim Review Report

In September 2023, the Agency reported that mother had been arrested after police responded to another domestic violence call at her home. After becoming intoxicated and angry, mother became verbally abusive and punched Richard in the mouth. Mother later claimed, "nothing really happened" and denied drinking alcohol or becoming intoxicated. Mother was scheduled to start her first individual counseling session on September 20, 2023. She started anger management but had already missed four out of seven classes. She also started domestic violence and parenting classes and a family life skills program. She denied having a substance abuse problem, claiming she had been clean and sober for 13 years. Mother was discharged from the program in August 2023 due to her dishonesty about having tested positive within the past 90 days.

The caregiver reported that the minors were exhibiting behavioral issues following visits with the parents. After one visit with mother, C.W. wet and soiled herself and suffered night terrors. During other visits, mother had to be redirected because she was making false promises to the children or was distracted by her phone.

Agency's Section 388 Petition

On September 26, 2023, the Agency filed a section 388 petition to suspend the parents' previously ordered six hours of separate weekly supervised visits pending

investigation into new disclosures made by C.W. The petition alleged C.W. made "new disclosures" and was scheduled for an assessment and the Agency was concerned with the frequency and quality of mother's visits. The juvenile court ordered a hearing on the Agency's section 388 petition and temporarily suspended the parents' visits with the children until C.W.'s assessment was completed. The parties subsequently reached an agreement whereby the Agency withdrew its section 388 petition and the court provided mother with three hours of weekly supervised visits with C.W. and E.W. and three hours with J.W.

Interim Review Reports and Hearings

In November 2023, the Agency informed the juvenile court that C.W. and E.W. were moved to separate placements due to concerns that C.W. was inappropriately touching E.W. The Agency also reported that C.W. experienced several instances of accidentally urinating on herself following visits with mother.

The Agency's January 2024 six-month review report recommended the juvenile court terminate both parents' reunification services and set a section 366.26 hearing. Mother was reportedly living with Richard. She claimed their relationship was healthy and loving despite the domestic violence incident in September 2023 that led to her arrest for battery against Richard. Mother adamantly disputed the incident and denied consuming alcohol notwithstanding her positive test. She was participating in domestic violence classes but had missed several sessions and was evasive about her arrest. She was also participating in family life skills on a weekly basis and successfully completed the parenting education program, along with the 12 weekly individual therapy sessions after which she demonstrated insight. Mother's random drug test results were all negative with the exception of barbiturates she was prescribed for her migraines. Mother maintained consistent, appropriate supervised visits with the children and was reportedly nurturing and positive and required little redirection.

7

Father had eventually attended 40 domestic violence group sessions and had slowly improved and began to accept feedback. Father's participation in parenting education classes and outpatient substance abuse treatment could not be verified. All but one of his random drug test results were negative and he maintained consistent, appropriate supervised visitation with the children.

The Agency concluded that, after 16 months of services, and despite having consistent visitation with the children, neither parent demonstrated the capacity to complete all case plan objectives to ensure the children's safety. Mother was in denial about the ongoing safety concerns related to her domestic violence relationship with Richard and her alcohol and substance abuse. Father chose new employment that directly conflicted with his treatment schedule, leading to his disenrollment from his parenting program.

On January 30, 2024, the juvenile court found the parents made minimal progress toward alleviating or mitigating the causes necessitating placement of the children and ordered additional reunification services for both parents.

Mother's Section 388 Petitions

On February 20, 2024, mother filed section 388 petitions on behalf of each minor and J.W. to modify the juvenile court's visitation orders to allow Richard (now the father of her unborn child) to join her during her visits with the children. Pursuant to the parties' agreement, the court ordered that Richard be permitted to attend one supervised visit per month. Father's visits were also increased and J.W. was reincorporated into the visitation schedule.

Agency Memorandum

On April 5, 2024, the Agency reported that, since the court's order increasing visitation, the minors had been exhibiting "noticeable regressive behaviors." C.W. was having rolling tantrums, more frequent urine and fecal accidents, an inability to focus at

school, and a need for more constant attention and reassurance. She was also observed removing her clothing and publicly fondling herself at school. E.W. was having an increase in tantrums and was biting others.

### C.W.'s Section 388 Petition

On May 21, 2024, counsel for C.W. filed a section 388 petition to modify the juvenile court's orders allowing Richard to participate in visits and reincorporating J.W. into visits with C.W. It was argued that, since the changes in visitation, C.W. had been struggling with increased sexualized behaviors and tantrums both at home and in school. The court temporarily suspended visits between Richard and the children and between C.W. and J.W.

### 12-Month Review Report and Hearing

In its May 2024 12-month review report, the Agency changed course and recommended the juvenile court continue reunification services for both parents with the minors and J.W. remaining in their current placements. The parents were attending anger management and co-parenting classes and random drug testing. Mother was reportedly making progress but had issues with lying. Her family life skills program was terminated due to her resistance to ongoing services. Father was participating in anger management but still lacked accountability, utilized denial and avoidance when discussing the issues, and failed to attend some sessions without explanation. Mother's 14 random drug tests were negative for substances other than barbiturates she was prescribed for migraine headaches. Father's random drug tests were all negative.

At the 12-month review hearing in June 2024, the juvenile court continued reunification services for the parents, set an evidentiary hearing for C.W.'s section 388 petition, continued the temporary suspension of visits between C.W. and J.W. and between C.W. and Richard, and gave the Agency authority to increase visits between the

9

parents and the children. In July 2024, the court ordered supervised visits between Richard and E.W. and between Richard and C.W.

18-Month Review Report and Hearing

The 18-month review report stated that, on August 27, 2024, the minors' infant half-sibling R. (mother's child with Richard) was removed from mother and Richard pursuant to a protective custody warrant due to a domestic violence incident between mother and Richard. Mother continued to participate in anger management classes but was reportedly defensive and in denial, she minimized the facts, and she had a distorted sense of reality. She was regularly drug testing but there was concern she might be manipulating the results as her tests were unsupervised and she had diluted and negative tests despite regularly taking prescribed barbiturates for her migraine headaches. Mother's visits with the children were described as nurturing but "chaotic." She at times appeared overwhelmed and resorted to making demands on the children to settle disputes and using bribery tactics to gain their compliance. During one visit, mother gave J.W. an unauthorized cell phone containing graphic videos of mother and Richard engaged in sexual acts, gang indicia, and inappropriate text messages.

Father was terminated from his anger management program in September 2024 due to excessive absences and failure to meet minimum program standards. He drug tested 13 times, three of which were positive for methamphetamine and one of which was positive for the same barbiturate medication mother was prescribed. Although father's visits with the children were appropriate, he was unable to demonstrate an ability to consistently manage the children's behaviors, was often overwhelmed and frustrated, and appeared unwilling or unable to follow through with parenting techniques learned over the course of his parenting classes despite input from visitation monitors.

The Agency concluded there continued to be "grave danger" if the children were returned to mother given she received over 18 months of services but continued to be

10

involved in a domestic violence relationship with Richard, was likely abusing alcohol, and was not forthcoming with the Agency or service providers. The Agency recommended the court continue the minors and J.W. in out-of-home placement, terminate the parents' reunification services, and set the matter for a section 366.26 hearing.

After numerous continuances, the 18-month review hearing commenced on January 31, 2025. The parents submitted on the Agency's reports and recommended findings and orders. Finding the parents made minimal progress toward alleviating or mitigating the causes necessitating placement, the juvenile court terminated the parents' reunification services, made visitation orders, and set the section 366.26 hearing.

### Agency's Section 388 Petition

On April 7, 2025, the Agency filed a section 388 petition to modify the juvenile court's visitation orders to decrease the parents' visits with the minors. The Agency asserted that C.W. was becoming more dysregulated and having more bathroom accidents after visits with the parents; mother lacked connection with the minors during visits and had difficulty managing their behaviors, often defaulting to technology; and father continued to show frustration and struggled with regulating his own emotions during visits. E.W. was also dysregulated after visits with the parents and his behaviors at daycare and at home had grown more challenging after visits such that it was recommended he start mental health and additional support services. The Agency argued the minors would benefit from less visitation with their parents given the minors' ongoing challenges, including C.W.'s increased dysregulation and enuresis and E.W.'s increased dysregulation and behavioral issues.

### Mother's Section 388 Petition

On April 23, 2025, mother filed a section 388 petition as to each minor to modify the juvenile court's order terminating her reunification services. She requested additional

11

services, liberalized visitation (to include overnight visits and preapproval for Richard to be included in her visits), and authorization for a bonding study. Mother argued she continually engaged in services, had no incidents of domestic violence since removal, consistently visited the minors, and was currently participating in reunification services with the minors' half-sibling R. She further argued the request was in the minors' best interests because they had been continually in her care except for the almost two-year period of removal, her visitation had been consistent, the minors were bonded to mother as their primary parent, and mother expected to reunify with the minors' half-sibling.

Section 366.26 Report

In its June 2025 section 366.26 report, the Agency concluded the termination of parental rights would not be detrimental to the minors, as the benefit of maintaining contact with the parents did not outweigh the benefit of permanency through adoption. The Agency recommended the court terminate parental rights as to C.W. and E.W. but continue the plan of guardianship for J.W. without terminating parental rights as to him.

Hearings on Section 388 Petitions

On June 13, 2025, at the contested hearing on the Agency's section 388 petition, mother temporarily agreed to a reduction in her visitation until the section 366.26 hearing. The juvenile court noted ongoing and persistent issues with visits, and the negative effects visits were having on the children and ordered father's visits also be reduced.

Mother's section 388 petition was heard on July 15, 2025. Mother testified that she sought out services on her own after her services were terminated by the juvenile court. She claimed she had been clean since September 29, 2013, and was attending 12-step meetings. She claimed her positive tests for alcohol were the result of her being a diabetic and taking insulin, and her positive tests for amphetamines were the result of taking Gabapentin to relieve nerve pain. She also claimed C.W.'s behavioral issues were

12

attributable to the fact that the minor was separated from her family, and the minors' bathroom accidents were the result of being removed from her custody. She denied knowing anything about C.W. acting out sexually until recently, and she denied knowing why the minors and J.W. needed separate visits.

The juvenile court expressed its concerns about mother's lack of insight and accountability and the fact that she spent a lot of time on her phone during visits with the minors. The court also questioned mother's credibility regarding her knowledge, or lack thereof, regarding the minors and J.W. acting out sexually. The court denied mother's section 388 petition, finding her circumstances were changing but not changed and the requested modifications were not in the minors' best interests.

Contested Section 366.26 Hearing

The section 366.26 hearing commenced on July 24, 2025. The parties stipulated that mother would testify to a number of things, including: she was the minors' primary caregiver from birth to removal; she consistently visited the minors since removal to the best of her ability; the minors recognized her and responded with positive emotions when seeing her; the minors wanted to be physically close to her during visits; C.W. asked mother if C.W. could come home and she asked to be allowed to live at the placement with E.W.; and the minors responded positively to her direction and guidance. Mother's stipulated testimony also included her opinion that, if parental rights were terminated, the minors would be permanently harmed in the following ways: they displayed sadness when leaving her; E.W. has a diagnosis of autism and he is primarily nonverbal and unable to express his feelings and this would prevent him from processing her loss; C.W. demonstrated behavioral issues attributable to her fear of separation from mother; and C.W. no longer slept through the night when not with mother.

The juvenile court found the minors adoptable and the beneficial parental relationship exception did not apply and terminated parental rights as to the minors.

DISCUSSION

*I*

*Denial of Mother's Section 388 Petition*

Mother contends the juvenile court abused its discretion when it denied her section 388 petition requesting reinstatement of reunification services. She claims she demonstrated changed circumstances by showing she substantially complied with her case plan and demonstrated adequate control of the issues that resulted in the removal of the minors from her custody. She further claims she demonstrated the requested services were in the minors' best interests based upon the minors' strong relationship with her and upon C.W.'s desire to live with and have more contact with her. Father purports to join in this argument. The Agency argues neither parent appealed the juvenile court's denial of mother's section 388 petition so the claim is forfeited. As we explain, the section 388 claim will be dismissed, as father has not demonstrated he has standing and, in any event, the claim is forfeited because neither parent included an appeal from the denial of mother's section 388 petition in their notice of appeal.

Standing

"Whether a person has standing to raise a particular issue on appeal depends upon whether the person's rights were injuriously affected by the judgment or order appealed from. [Citation.] A person does not have standing to urge errors on appeal that affect only the interests of others. [Citation.] Accordingly, a parent is precluded from raising issues on appeal which do not affect his or her own rights." (*In re A.K.* (2017) 12 Cal.App.5th 492, 499; see *In re J.C.* (2014) 222 Cal.App.4th 1489, 1492.) Where, as here, the facts are not in dispute, we review a question of standing de novo. (*Brewer v. Superior Court* (2017) 16 Cal.App.5th 1019, 1023, quoting *People v. Koury* (1989) 214 Cal.App.3d 676, 685.)

14

Here, mother filed a section 388 petition on her own behalf seeking additional reunification services. Although father did not object to mother's petition in the juvenile court, he did not join in the petition either. Father did not demonstrate below, nor does he here, that he was injuriously affected by the court's denial of mother's request to restart services. Therefore, father lacks standing to join in mother's section 388 claim. In any event, the challenge to the juvenile court's denial of mother's petition is forfeited.

Forfeiture

The July 15, 2025, order denying mother's section 388 petition was an appealable order. (*In re J.F.* (2019) 39 Cal.App.5th 70, 75.) Mother and father each filed separate notices of appeal stating they were appealing from the court's July 24, 2025, order terminating parental rights. Both notices omitted any reference to the court's July 15, 2025, order denying mother's section 388 petition, and both left unchecked the box (7(e)) indicating the appeal was from the section 388 order.

A notice of appeal "is sufficient if it identifies the particular judgment or order being appealed." (Cal. Rules of Court, rules 8.100(a)(2), 8.405(a)(3).) The parents' respective notices of appeal did not identify the order denying mother's section 388 petition and were therefore insufficient. Further, mother did not request that we construe her notice of appeal to include the section 388 order, nor did either parent file a reply brief responding to the Agency's forfeiture argument, thereby effectively conceding the issue. " ' "Our jurisdiction on appeal is limited in scope to the notice of appeal and the judgment or order appealed from." [Citation.] We have no jurisdiction over an order not mentioned in the notice of appeal.' [Citation.]" (*In re J.F., supra,* 39 Cal.App.5th at pp. 74-75.) The parents' section 388 claim is forfeited.

15

*Beneficial Parental Relationship Exception*

Next, mother contends the juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply. She claims the court improperly analyzed the third element of the exception under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). Again, father joins in mother's argument. The claim has no merit.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.*, *supra*, 11 Cal.5th at pp. 625-626.)

The party claiming the exception has the burden of establishing supporting circumstances. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.*, at p. 636.)

The factual predicate of the beneficial parental relationship exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 630.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id.* at pp. 640-641.)

Here, as for the first element – regular visitation and contact – the parties did not dispute and the juvenile court found that the minors were likely to be adopted and the parents maintained regular visitation and contact with them. Likewise, regarding the second element – substantial, positive, emotional attachment – the juvenile court found the minors had a substantial, positive bond with mother "that would continue to benefit both children." Thus, neither the first nor second element is at issue.

However, even with the court finding that mother had established the first two elements, the parents did not meet their burden to prove the third element – termination of the parent/child attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parents argue the court failed to properly examine "the nature of the parent-child relationship to evaluate whether [the minors] had a significant, positive, emotional attachment with their mother," and thus the court was unable to make the required determination whether it would be detrimental to sever the minors' relationship with mother. (*Caden C., supra,* 11 Cal.5th at p. 633.)

The beneficial parental relationship exception "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575-576; *In re A.G.* (2020)

17

58 Cal.App.5th 973, 995.)  Here, contrary to the parents' claim, the juvenile court properly analyzed the minors' relationship with mother.

As we have recounted, the court expressly found that the minors had a substantial, positive bond with mother "that would continue to benefit both children," noting C.W. had on occasion expressed a desire to return to mother's custody.  Nonetheless, the court analyzed the parent-child relationship and concluded the benefits of maintaining that relationship did not outweigh the benefits of adoption.  The evidence supports that finding.  The court noted the minors' ages (six and four years old) suggested they would benefit from adoption.  Although the minors spent the first portion of their lives in the mother's care, thereafter they were in the custody of their caregivers with whom, by all accounts, they had strong emotional bonds.

The juvenile court also considered the positive and negative effects of interaction between mother and the minors, most notably the "regressive" behaviors exhibited by the minors after visits with mother as noted, at least in part, in a letter from Dr. Alexander, C.W.'s child psychiatrist.  Dr. Alexander stated C.W. experienced "high levels of psychological stress" following visits with mother.  The emotional stress caused C.W. to soil her pants twice and wet herself four times the day after one visit, something she had not experienced prior to the visit.  Dr. Alexander concluded that visits with mother put "undue stress on [C.W.'s] psyche" and "her mental health would benefit enormously from stopping visits with her biological family."  Similarly, the Agency's section 366.26 report stated E.W. was a "train wreck" after visits with mother, running around the caretaker's home, jumping on furniture, and fighting with the other children in the home.  E.W. also suffered from regression in bathroom habits correlated to visits with mother.  The report stated E.W. never talked or asked about his parents between visits and simply viewed them as "another caring adult in his life."

Finally, the juvenile court appropriately "[took] into account the children's special needs," which included mental health services, therapy, and medication for C.W., and

18

behavioral intervention and mental health services for E.W., as well as services to address his autism diagnosis

In order to meet the burden of proving the exception, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits…." (*In re A.G., supra,* 58 Cal.App.5th at p. 95.) While acknowledging the parents' regular visitation and contact with, bond with, and love for their children, the juvenile court found the parents had not satisfied their burden of proving the third element of the beneficial parental relationship exception. The court did not err.

## III

## ICWA

Finally, the parents contend the juvenile court failed to ensure the Agency complied with its mandatory duty of ICWA inquiry and therefore the juvenile court's finding that the ICWA does not apply is not supported by the evidence.

ICWA Background

At the inception of the dependency proceedings, mother reported Native American ancestry through the Cherokee Nation. Mother indicated that her great-grandmother (maternal great-great-grandmother Bessie) was an enrolled member of the tribe but mother did not have any additional information because maternal great-great-grandmother Bessie was deceased. Mother stated she would inquire further of her family members to determine if anyone else in the family had information regarding the family's Indian heritage.

At the August 17, 2022, detention hearing, mother informed the court that her parents (maternal grandparents) and her grandmother Helen (maternal great-grandmother Helen) were Cherokee Indians, and maternal great-great-grandmother Bessie was an enrolled member of the Cherokee Tribe. Mother also reported, however, that maternal grandparents and maternal great-grandmother Helen were all deceased. She noted her

19

aunt (maternal great-aunt) lived in Mexico and might have more information and she promised to provide the maternal great-aunt's contact information to the Agency.

Father indicated he had possible Indian ancestry with the Navajo Tribe. He stated his family was from New Mexico and his mother was Indian. He also stated his aunt (paternal great-aunt Stella) wrote a book about his family's heritage and had previously said his family was "Mestizos Navajo." (The Agency reported "mestizos" is not a tribe but rather a general term referring to indigenous peoples of Latin America.) Father stated he would contact his relatives for more information. The court ordered both parents to complete ICWA-020 forms.

In September 2022, the Agency reported it sent written inquiries via email to the Navajo Nation and the Cherokee Nation on August 31, 2022. The Cherokee Nation responded the same day indicating neither mother nor the minors were enrolled or eligible for enrollment in the tribe. The Navajo Nation responded acknowledging receipt of the inquiry but stating it had yet to determine the minors' eligibility.

In October 2022, the Agency filed the ICWA-030 form it mailed to the parents, the Bureau of Indian Affairs (BIA), and four tribes (the Cherokee Nation, the Colorado River Indian tribes, the Navajo Nation, and the Ramah Navajo Chapter/Navajo Nation). The ICWA-030 included information about maternal grandmother Marianne, maternal grandfather Dexter, paternal grandmother Isabel, paternal grandfather John, maternal great-grandmothers Doris and Helen, and maternal great-grandfathers J.P. and Vern, all of whom were deceased.

In February 2023, the Agency reported that mother reiterated her Native American ancestry through the Cherokee Nation. Father informed the Agency that he contacted several of his relatives regarding his family's heritage. Father stated he called his cousin, who was unaware of any Indian ancestry. He also spoke with paternal great-aunt Stella who lives in New Mexico, and she informed him the family had Pueblo ancestry but did not specify which tribe. Father stated none of his extended family members were

20

registered with any tribe. The Agency also reported that responses to its ICWA inquiry were still pending from the Colorado River Indian Tribe and the Ramah Navajo Chapter/Navajo Nation.

On February 27, 2023, the Agency filed an updated ICWA-030 form reflecting the former recipients as well as 21 new recipients, all Pueblo tribes.

In May 2023, the Agency reported its receipt of responses from the Cherokee Nation, the Navajo Nation, and 13 of the Pueblo tribes indicating the minors were not enrolled or eligible for enrollment.

From September 2023 through June 2025, the Agency reported its ICWA inquiry efforts and its receipt of responses from the various tribes indicating the minors were not members or eligible for membership. During that period of time, mother reiterated her ancestry with the Cherokee Nation, stated maternal great-great-grandmother Bessie was deceased, and declined to provide further contact information for any other maternal relatives. However, she later provided the names and telephone numbers of several maternal relatives. The social worker attempted to contact maternal great-aunt Billie, maternal great-aunt Pat, maternal aunt Denise, and maternal cousin Arin, leaving voicemail messages for each to return her call. Maternal cousin Arin returned the call and stated maternal great-great-grandmother Bessie had a roll number with the Cherokee Tribe but had no additional information. The social worker also inquired of maternal aunt Machaela, who indicated she had no knowledge other than what mother previously reported. When the social worker inquired again of father, he stated he had already provided all the information he had and declined to provide any contact information for extended family members.

In its June 2025 section 366.26 report, the Agency reiterated its ICWA inquiry efforts and reported its receipt of responses from all the tribes contacted indicating the minors were not members or eligible for membership. The Agency also requested the juvenile court find the minors were not Indian children and the ICWA did not apply.

21

At the section 366.26 hearing on June 24, 2025, the juvenile court noted the "very substantial discussion" of ICWA in the Agency's report and found the Agency diligently completed its ICWA inquiry and investigation, receiving negative responses from all potential tribes. The court thereafter found the ICWA did not apply.

Applicable Law

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings. [Citations.] A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) "Under ICWA's state analogue statutes [the California Indian Child Welfare Act] (Cal-ICWA … ), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child … is or may be an Indian child' in dependency cases." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125; § 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of

22

section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

On appeal, we review ICWA findings and orders for substantial evidence. (See *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.) A finding that ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) The juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

Analysis

The parents claim the Agency failed to inquire of five extended family members: maternal great-great-grandmother Bessie, maternal great-aunt Billie, maternal great-aunt Pat, maternal aunt Denise, and maternal cousin Arin. The record proves otherwise. Mother identified maternal great-great-grandmother Bessie early in the proceedings and reported she was deceased. Mother did not identify or provide contact information for maternal great-aunt Billie, maternal great-aunt Pat, maternal aunt Denise, and maternal cousin Arin until August 23, 2024, two years into the proceedings. The social worker attempted to contact those four relatives that same day and left voicemail messages for them to return her call. Whether an agency has exerted enough effort to contact a relative for whom it did not have contact, but for whom it had contact information depends upon a number of fact-specific questions, including "whether the number is still valid, whether the person answers, whether you can leave a message, whether the person responds to your message, whether you can pick up immediately if they do respond, whether you

23

need an interpreter, and so forth." (*In re K.G.* (2025) 117 Cal.App.5th 379, 385.) Maternal cousin Arin was the only relative to return the call, albeit three weeks later, confirming maternal great-great-grandmother Bessie had a roll number with the Cherokee Tribe but providing no additional information. The Agency received no response from maternal great-aunt Billie, maternal great-aunt Pat, or maternal aunt Denise.

On the other hand, the Agency inquired of both parents and was able to contact and inquire of maternal aunt Machaela. Machaela, however, had no knowledge other than what mother had already provided. With the information provided by every source it could contact, the Agency sent ICWA-030 forms to various Cherokee, Navajo, and Pueblo tribes to make further inquiry regarding the possible Indian status of the minors. (§ 224.2, subd. (e)(2).) As for the relatives who were contacted by the social worker but did not respond to the voicemail instructing them to return the call, the Agency cannot force relatives to cooperate with its inquiry. Moreover, "[i]t is not mandatory for the [Agency] always to 'inquire of everyone who has an interest in the child.' [Citation.] The law of diminishing returns is at work. 'The juvenile court has discretion to determine when enough is enough.' [Citation.]" (*In re K.G., supra,* 117 Cal.App.5th at p. 385.) "There is no need for further inquiry if no one has offered information that would give the court or [the agency] reason to believe that a child might be an Indian child. This includes circumstances where parents 'fail[] to provide any information requiring followup' [citations], or if the persons who might have additional information are deceased [citation], or refuse to talk to [the agency]." (*In re A.M.* (2020) 47 Cal.App.5th 303, 323, disapproved on other grounds in *In re Dezi C., supra,* 16 Cal.5th at p. 1152, fn. 18.) On this record, the juvenile court was well within its discretion when it determined the Agency's ICWA inquiry was adequate.

The parents further claim the ICWA-030 forms sent to the Cherokee Tribes were incomplete because they omitted maternal great-great-grandmother Bessie's full name and roll number.

24

As a preliminary matter, we reject the parents' assertion that the Agency's act of providing ICWA-030 notices to the tribes and the BIA was "an implicit determination that there was reason to know the [minors] were Indian children." As one often sees in juvenile dependency proceedings involving ICWA matters, the agency will utilize the ICWA-030 form as a means of *contacting* the tribes for the purpose of making "further inquiry regarding the possible Indian status of the child" as required by section 224.2, subdivision (e)(2); *In re Dezi C., supra,* 16 Cal.5th at pp. 1132-1133; *In re Claudia R.* (2025) 115 Cal.App.5th 76, 84-85.) The parents have provided no authority, nor are we aware of any, supporting their assertion that use of the ICWA-030 form is limited to *noticing* the tribes once there is a reason to know the minor is an Indian child. Further, we see no reason to discourage use of the ICWA-030 form as an appropriate means of *inquiry*.

In any event, the ICWA "noticing" requirement is triggered only when there is "reason to know" the minor is an Indian child. (§§ 224.2, subds. (d) & (f), 224.3.) Here, the juvenile court never found there was a reason to know the minors were Indian children. Based on the information provided by the parents and the extended relatives with whom it was able to make contact, and the information in the ICWA-020 forms, the Agency concluded there was a reason to believe the minors may be Indian children thus requiring further inquiry, including "[i]nterviewing the parents, Indian custodian, and extended family members" to gather the required information to ascertain whether there was a reason to know. (§ 224.2, subd. (e)(2)(A).) In this regard, contact with the relevant tribes "shall, at a minimum, include telephone, facsimile, or electronic mail contact" to the tribe's designated agent and "shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination…." (§ 224.2, subd. (e)(2)(C).)

Here, the Agency utilized the ICWA-030 form as their means of contacting and inquiring of the BIA and the Cherokee, Navajo, and Pueblo tribes and sharing

25

information regarding the minors' extended family members. Again, short of providing inaccurate or misleading information, use of the ICWA-030 form is an appropriate means of "interviewing" the tribes and "sharing information" for purposes of section 224.2, subdivision (e). Under these circumstances, such contact was not subject to the same notice requirements as those set forth in section 224.2, subdivisions (d) and (f). The Agency provided information regarding the minors' extended family members, including both maternal grandparents, both paternal grandparents, both maternal great-grandmothers, and both maternal great-grandfathers. All the tribes responded to the Agency's inquiry stating the minors were not considered Indian children for purposes of the ICWA. There is nothing in the record to suggest the tribes required or requested additional information before making their respective determinations.

The juvenile court's finding that the ICWA does not apply was supported by substantial evidence.

### DISPOSITION

The juvenile court's orders are affirmed.


/s/
HULL, J.

We concur:


/s/
EARL, P. J.


/s/
MESIWALA, J.

26